**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FERGUSON ENTERPRISES, INC.,<br>Plaintiff<br>v.<br>NAVISTAR, INC. AND NAVISTAR INTERNATIONAL CORPORATION,<br>Defendants. | Case No. 1:16-CV-11164<br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Ferguson Enterprises, Inc. brings this complaint against Navistar International Corporation and its subsidiary, Navistar, Inc. (collectively, "Navistar") and alleges as follows:

## I. Nature of the Action

1. Ferguson brings this action for money damages to recover the losses it incurred from its purchase of nearly five hundred Navistar trucks ("Trucks") equipped with a 2010 - 2013 model year MaxxForce 11, 13, or 15 Advanced EGR diesel engine (the "MaxxForce Engines" or "Engine"). Ferguson later discovered that the trucks' Engines were defective.

2. Navistar sold Ferguson Trucks with 2010-2013 model year Engines that were equipped with a defectively-designed integrated emissions system (the "Defect").

3. The Engines were defective because Navistar chose to use a flawed and defective Exhaust Gas Recirculation ("EGR") emissions technology in an effort to comply with Environmental Protection Agency ("EPA") emissions standards for its MaxxForce Engines manufactured for its trucks with model years 2010 and later ("2010 EPA Standards"). When Navistar sold the Trucks, it knew, should have known (or recklessly disregarded) that the EGR

technology did not work, that it caused damage to the Engines and Trucks, and that it rendered the Trucks dangerous to drive.

4. The Defect caused, among other things, numerous serious breakdowns, engine failures and dangerous conditions or events, such as sudden engine failure and breakdown, coolant and exhaust fume venting into the passenger compartment of the Trucks, and engine failure requiring extensive repairs and downtime, including failures so thoroughly damaging that the Engines had to be rebuilt.

5. Ferguson paid far more for the Trucks than it would have had it known that the Engines were built with the Defect. At the time of sale, the Trucks equipped with defective Engines were worth significantly less than the price that Ferguson paid for them. To avoid incurring further damages resulting from the Defect, Ferguson has been forced to re-sell many of the Trucks at a substantial loss.

## II. The Parties

### A. Plaintiff

6. Plaintiff Ferguson Enterprises, Inc., the country's largest distributor of plumbing supplies and PVF (pipe, valves, and fittings), is a Virginia company headquartered in Newport News, Virginia. It has nearly 20,000 employees.

7. As the largest distributor of PVF in the United States, Ferguson's trucking fleet is critical to its everyday business operations.

### B. Defendants

8. Defendants Navistar International Corporation and Navistar, Inc. are both incorporated in Delaware. The Defendants share a headquarters at 2701 Navistar Drive, Lisle, Illinois 60532.

9. Defendant Navistar, Inc. is a wholly owned subsidiary of Navistar International Corporation.

10. Navistar, Inc. manufactured the International-brand commercial trucks with MaxxForce-brand diesel engines that are at issue in this action.

11. Navistar, Inc. is an alter ego and/or agent of Navistar International Corporation. This complaint therefore will refer to them either as "Navistar" or the "Navistar Defendants."

**a. Defendant Navistar, Inc. is an Alter Ego of Defendant Navistar International Corporation, and the Two Companies Have Abused the Corporate Form.**

12. Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc., and the two corporations are not separate.

**i. Defendant Navistar International Corporation has financial interest, ownership and control over Defendant Navistar, Inc.**

13. Defendant Navistar, Inc. has claimed that it is a wholly-owned subsidiary of a "holding" company, Defendant Navistar International Corporation.

14. Defendant Navistar, Inc.'s income is reported on a consolidated return with Defendant Navistar International Corporation to the SEC.

15. Defendant Navistar, Inc.'s income is funneled directly to Defendant Navistar International Corporation as income from a subsidiary.

16. The financial benefit of Defendant Navistar, Inc.'s actions accrues solely to the shareholders of Defendant Navistar International Corporation. The Board for Navistar International Corporation "establishes corporate policies, sets strategic direction and oversees management, which is responsible for day-to-day operations" of Navistar, Inc.

17. Defendant Navistar International Corporation therefore has financial interest, ownership and control over Defendant Navistar, Inc.

**ii. There is such unity between the two corporations that the separateness between them has ceased.**

18. Defendants Navistar International Corporation and Navistar, Inc. share both common officers and common physical offices.

19. Defendant Navistar International Corporation's most recent quarterly report, filed with the SEC on September 8, 2016, states that its principal operating entities are Defendant Navistar, Inc. and Navistar Financial.

20. On information and belief, Navistar International Corporation is operated by Navistar, Inc. employees.

21. Based on Navistar International Corporation's public statements and official filings with the SEC, all or most of the officers of Navistar International Corporation also hold positions as officers and/or directors of Navistar, Inc. At times, Navistar International Corporation has claimed that it had no operational employees and that it only had one "employee" in any capacity: The CEO of Navistar International Corporation, who is also the CEO of Navistar, Inc.

22. The "officers" of Navistar International Corporation are all officers for Navistar, Inc.

23. Navistar International Corporation's investor relations department is staffed solely by Navistar, Inc. employees.

24. Navistar, Inc. and its financial activities—manufacturing engines and trucks and selling them through authorized dealers—exist solely for the benefit of Navistar International Corporation.

25. Navistar International Corporation's most recent quarterly reports show that most of its gross revenues come from Defendant Navistar, Inc.

26. When Navistar International Corporation's "officers" discuss sales of trucks to customers on earnings calls, in press releases, and in analyst presentations—sales made presumably by Navistar, Inc.—they discuss "our engine volumes" and "our trucks and parts business."

27. Navistar, Inc. is the primary operating business of Navistar International Incorporation. On information and belief, any shareholder gains and losses of defendant Navistar International will be predominantly due to the operations of Navistar, Inc.

28. Navistar International Corporation and Navistar, Inc. act in complete cooperation with each other and with knowledge of each other action's when they deliver information to the public. For example, the "navistar.com" website—including information from and about Navistar International Corporation—contains information regarding both truck sales and sales of shares to investors.

**iii. Holding only one Defendant liable without the other would gravely injustice Ferguson.**

29. On information and belief, one or the other of the Defendants may be inadequately capitalized.

30. On information and belief, Defendants use this corporate form to avoid their legal obligations to their customers and the public. The common officers of the parent and subsidiary made presentations to analysts, investors, and Ferguson itself in order to gain media attention and generate sales, but, when customers or investors attempt to hold the parent company accountable for those very statements and the direct benefit the parent company and shareholders obtains from those sales, the parent company points to the subsidiary, which now may have, on information and belief, inadequate capital to alone withstand the obligations incurred as a result of its representations to Ferguson and its defective Trucks.

**b. In the alternative, Navistar International Corporation is liable for the actions of Navistar, Inc. because Navistar, Inc. is Navistar International Corporation's agent.**

31. Based on Navistar International Corporation's public statements and official filings with the SEC, all or most of the officers of Navistar International Corporation also hold positions as officers and/or directors of Navistar, Inc.

32. The financial benefit of Defendant Navistar, Inc.'s actions accrues solely to the shareholders of Defendant Navistar International Corporation.

33. The Board for Navistar International Corporation "establishes corporate policies, sets strategic direction and oversees management, which is responsible for day-to-day operations" of Navistar, Inc.

34. Navistar, Inc. and its financial activities—manufacturing engines and trucks and selling them through authorized dealers—exist solely for the benefit of Navistar International Corporation.

35. When Navistar International Corporation's "officers" discuss sales of trucks to customers on earnings calls, in press releases, and in analyst presentations—sales made presumably by Navistar, Inc.—they discuss "our engine volumes" and "our trucks and parts business."

36. On information and belief, Navistar International Corporation has the right to control Navistar, Inc.'s conduct.

37. On information and belief, Navistar, Inc. has the right to act on behalf of Navistar International Corporation.

38. On information and belief, Navistar International Corporation explicitly granted Navistar, Inc. the authority to sell the Trucks, to warrant the Trucks, and to make binding representations about the Trucks on its behalf.

39. In the alternative, Navistar International Corporation was the apparent agent of Navistar, Inc.

40. The website navistar.com identifies most of the company's leaders as officers of Navistar International Incorporated. It then, under the "What We Do" section, explains that "Navistar offers one of the world's premier and most trusted truck brands."

41. On information and belief, Navistar International Corporation allowed Navistar, Inc. to sell Trucks, warrant them, and to make binding representations about the Trucks on its behalf.

42. Ferguson, therefore, in good faith believed that Navistar, Inc. possessed the authority to sell the Trucks, warrant the Trucks, and to make representations about the Trucks on behalf of Navistar International, Inc.

43. Ferguson relied to its detriment on the authority of Navistar, Inc. when it purchased the Trucks and the express warranties that came with the Trucks. Ferguson purchased the Trucks with the reasonable expectation that the Trucks would be fully supported by Navistar International Corporation. But now that expensive problems have arisen with the Trucks, Navistar International Corporation seeks to shirk its responsibility, to the detriment of Ferguson.

44. Because Navistar, Inc. is an agent of Navistar International Corporation, Navistar International Corporation is vicariously liable for damages arising from this suit.

## III. Jurisdiction and Venue

45. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) because the amount in controversy exceeds $75,000 and because the action is

between citizens of different states. Ferguson is a citizen of Virginia and both Navistar defendants are citizens of Delaware and Illinois.

46. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) because both Navistar defendants reside in this judicial district.

## IV. Factual Allegations

### A. Background

47. On January 18, 2001, the EPA issued, under the authority given to it by the Clean Air Act (42 U.S.C. §§ 7401, et seq.), new emission standards for certain highway engines and vehicles. Those emissions standards, referred to herein as the "2010 EPA Standards," required manufacturers to, among other things, reduce nitrogen oxide (NOx) emissions to .20 grams per brake horsepower-hour (g/bhp-hr). Compliance would be measured by a percent-of-sale basis, i.e., for model years 2007, 2008, and 2009, 50% of a manufacturer's relevant engine and vehicle sales had to comply with the new standards, and for model year 2010, 100% of a manufacturer's sales had to be compliant.

48. The 2010 EPA Standards required manufacturers' emission control systems to be integrated with on-board diagnostic systems that could detect and identify malfunctions in all monitored emission-related engine systems.

49. Manufacturers are required, under Section 7541 of the Clean Air Act, to "warrant to the ultimate purchaser and each subsequent purchaser" that the manufacturer's vehicles and engines comply with the EPA's emissions standards.

50. Every manufacturer selling commercial trucks in the U.S. except for Navistar chose to meet the 2010 EPA Standards predominately with Selective Catalytic Reduction ("SCR") technology, which treats engine exhaust with a urea-based chemical after it leaves the

engine. SCR was proven technology and already in use in Europe and Japan. *See* Manufacturers Tout Their Choices for 2010, *Transport Topics*, (February 9. 2009) http://www.ttnews.com/articles/printopt.aspx?storyid=21254.

51. Navistar chose a different technology, Exhaust Gas Recirculation ("EGR"), to meet the 2010 EPA Standards. EGR technology attempts to reduce emissions by subjecting exhaust flowing out of the engine to a second burn in the cylinders. Navistar's Advanced EGR system, an integral part of the MaxxForce Engine's design, diverted some of the exhaust into an EGR cooler, which used ordinary engine coolant to lower the exhaust temperature. The cooled exhaust was then fed back into the engine's air intake through the EGR valves. The Advanced EGR system, however, created a large amount of pressure and heat that ultimately caused engine damage as well as damage to other parts of the Navistar vehicle.

52. Navistar International Corporation and its officers and directors, including its then-President and CEO, Daniel Ustian, insisted that Navistar, Inc.'s use the EGR system in the Engines, rather than an SCR system, to meet the 2010 EPA Standards, even though numerous Navistar, Inc. engineers and employees objected internally and advised management that the EGR system was defective. At all relevant times, Navistar International Corporation knew or should have known the MaxxForce engines were defective. Navistar International Corporation directly interfered with and exercised control over Navistar, Inc.'s decision making, and Navistar, Inc. was no longer free to utilize its own expertise. Navistar International Corporation therefore directly participated in the harm caused to Ferguson.

53. Ultimately, Navistar was unable to design the Engines so that they would comply with the emissions standards set forth by the EPA. Accordingly, in order to sell the Engines, Navistar had to pay non-conformance penalties to the EPA.

### B. The Navistar Defendants Knew About the Defect At Least as Early as 2004

54. Navistar knew that the EGR system was seriously flawed at least as early as 2004, when Navistar's 6.0-liter diesel engines – utilizing an EGR system – were used in various 2004 Model Year Ford vehicles. Faced with an unprecedented number of complaints about Navistar's 6.0-liter diesel engine, Ford eventually sued Navistar, Inc. for supplying defective engines. These problems persisted throughout the production life of those engines. Navistar's next diesel engine produced for Ford, the 6.4-liter engine, also had an EGR system, and also was plagued with problems throughout its production life in model years 2008 through 2010. The problems lead Ford to cease using the 6.4-liter EGR engines from Navistar after Model Year 2010. When Ford ceased using 6.4-liter EGR engines from Navistar, Ford switched to an SCR system.

55. Despite seeing firsthand the problems with the EGR system from 2004-2010, Navistar produced EGR-based engines, including the MaxxForce engines in the Trucks at issue here, that were sold to customers such as Ferguson.

56. Further, according to industry standards, truck engines of the type Ferguson purchased from Navistar are heavily tested for years before public distribution.

57. Manufacturers of commercial truck engines run the engines in controlled conditions for thousands of hours in order to simulate actual driving conditions.

58. As a result of this extensive testing, manufacturers obtain huge amounts of data regarding problems associated with engine performance.

59. Navistar was capable, or should have been capable, to utilize the data obtained from testing EGR-based engines to anticipate and predict the exact types of problems that would occur with the Engines that Ferguson purchased.

60. A complaint filed on August 22, 2014 against Navistar International Corporation demonstrates that Navistar was aware of the Defect and of the Engine's poor test results. The complaint[1] lists several confidential witnesses ("CWs") who discussed problems with EGR technology that were made known to Navistar. For example:

a. CW2, identified in the complaint as a former "Chief Engineer for the Engine Group on several Navistar truck and engine launches," noted problems with and expressed concerns about Navistar's EGR technology. CW2 presented those concerns to Navistar International Corporation's then-President and CEO, Daniel Ustian.

b. CW3, identified in the complaint as a "project development team lead for Navistar in its Fort Wayne, Indiana facility," claims to have been asked to assist in developing a fallback SCR solution in case the EGR solution was unsuccessful. However, Navistar, Inc. executives issued an order to quit development of the SCR backup plan.

c. CW5, identified in the complaint as a former "Navistar…Chief Engineer," allegedly told his supervisors that the EGR technology was not achievable given fuel economy and performance parameters and the stage of EGR development at the time. CW5 also informed his supervisors that the entire engineering community was saying that the physics of EGR was not possible.

d. CW8, identified in the complaint as a "Project Manager and Senior Project Manager at Navistar from 1997 through 2007," noted problems with a diesel particulate filter in the EGR engines that would "stop up and shut down the

[1] Construction Workers Pension Trust Fund – Lake County and Vicinity v. Navistar Int'l Corp., Civ. No. 1:13-CV-2111 (N.D. Ill.), Docket Entry 128.

engine as more exhaust flowed through the engine." This increase in exhaust gas recirculation also increased cooling demands on the engine, lowered fuel economy, and decreased durability.

e. CW12, identified in the complaint as "Navistar's Senior Vice President, North American Sales Operations," claims that Navistar International Corporation's President and CEO, David Ustian, told him directly not to discuss an alternate solution to the EGR technology or he would be fired.

f. CW13, identified in the complaint as a Navistar employee from July 2008 to April 2013 and holding various Vice President and Manager roles throughout that time period, claims that "[b]y mid-2011, the EGR solution engines were experiencing significant warranty issues." Mr. Ustian and other management personnel had access to these reports detailing the warranty issues.

g. CW16, identified in the complaint as a Navistar employee from 2007 until 2012, claims that it became apparent in 2011 that Navistar was experiencing an increase in failure of components of the EGR engines. The increase in failures was linked to an increase in exhaust gas flowing through the engine, and the resulting soot buildup.

h. CW18, identified as a Navistar employee since July 2001, states that the warranty problem was initially believed to be related to the EGR valve. However, even after the EGR valve's fix, warranty issues persisted through 2012, allegedly as a failure of the EGR cooler.

61. Therefore, Navistar knew the MaxxForce engines were defective before the first truck equipped with a MaxxForce engine was ever sold. Nonetheless, Navistar failed to disclose the problems with the MaxxForce Engines.

**C. Navistar Promised to Make any Defective Truck Function Properly**

62. The Trucks Ferguson purchased are covered by express warranties that Navistar issued.

63. Ferguson knew that Navistar had warranted the Trucks and would not have purchased the Trucks without a warranty. All express warranties from Navistar therefore form part of the basis of the bargain by which Ferguson purchased the Trucks.

64. As part of the warranty that Navistar issued with respect to every Truck that Ferguson purchased, Navistar promised to repair or replace any defective part of the vehicle with a non-defective part. This includes the Engine.

65. Navistar breached the warranties it issued to Ferguson because it did not or could not provide Ferguson with non-defective Engines.

66. Any attempt by Navistar to limit its warranty obligations or exclude remedies as they relate to the Defect is unenforceable because it is unconscionable. This is because: (1) the Defect in the MaxxForce Engines existed at the time of the sale, and manifested both inside and outside of the warranty period; (2) Navistar knew or should have known of the Defect before selling the Trucks; and (3) Ferguson did not have and could have discovered the Defect in the exercise of reasonable diligence before buying the Trucks.

67. Any attempt by Navistar to limit its obligations or exclude remedies is unenforceable because the warranty fails its essential purpose. This is because Navistar was unable and/or refused to fix the Defective Engines. Instead, when Ferguson presented the

Trucks for repair, Navistar simply replaced defective parts and systems with similarly defective parts and systems, ensuring additional failures both before and after the warranty period expired.

68. Once a Truck broke down for the first time, the Truck was never truly fixed. Indeed, the same Truck would often break down between four and six times over the course of just a few months' time. Some Trucks broke down immediately after being fixed.

69. Ferguson engaged directly with Navistar when trying to resolve the Trucks' Defects through warranty repairs. For example, Ferguson employees spoke to Navistar employee Chuck Matthews and others on a weekly basis to discuss and attempt to remedy problems with the Trucks. Ferguson employees also regularly interacted with Joe Mazur to discuss warranty issues and other problems with the Trucks. None of these interactions helped transform a Truck with the Defect into a Truck that functioned in the same way as a truck without the Defect.

70. Navistar ignored Ferguson when Ferguson informed Navistar representatives such as Deepak Kapur, Steve Billings, Chuck Matthews, and Joe Mazur that a defective Truck remained defective after a reasonable number of repair attempts and refused to offer anything other than replacing the Defect with additional defective Engines or engine parts.

71. So many Navistar Trucks were defective that Ferguson often had to wait for at least two weeks before a Navistar representative would look at a broken down truck that had been brought in to a repair shop for a warranty repair.

### D. Navistar's Authorized Dealers

72. Navistar provided a package of goods and service to buyers of International trucks with MaxxForce engines by manufacturing and distributing its products through a nationwide network of authorized dealers (the "Navistar Network").

73. Authorized dealers in the Navistar network had actual authority from Navistar to act as agents for Navistar in connection with the marketing, advertising, and selling of International trucks with MaxxForce engines.

74. Upon information and belief, dealers in the Navistar Network relied almost exclusively on materials and training received from Navistar when making representations about International trucks and MaxxForce engines to their customers.

75. Navistar regularly provided authorized dealers with International and MaxxForce branded literature, signage, and training materials for use in promoting, selling and financing the purchase or lease of their trucks to customers.

76. In addition, Navistar routinely held training seminars for authorized dealers in the Navistar Network.

77. During the seminars, Navistar coached dealers in the Navistar Network and their sales staff on the best ways to sell International trucks to customers by, for example, comparing competing manufacturers' product and outlining the specific information dealers should emphasize when pursuing a sale.

78. In areas where they lacked knowledge, dealers in the Navistar Network were encouraged to visit the navistar.com website for additional information about both Defendants.

79. Potential customers were also encouraged to visit the navistar.com website when seeking information about International trucks with MaxxForce engines.

80. The navistar.com website contained informational materials and statements to aid dealers and induce the customer to purchase or lease Navistar products.

81. In addition, Navistar furnished the actual specification of each truck, including fuel efficiency information, rather than relying on the dealers to provide those details for customers interested in purchasing International trucks.

82. Upon information and belief, Navistar provided the above-described training and information with the intent that the dealers in the Navistar Network would rely almost exclusively on it when making representations to potential customers and inducing customers to purchase or lease International trucks with MaxxForce engines.

83. Upon information and belief, in exercise of the authority granted to them by and at the direction of Navistar, authorized dealers relied upon such training and information when they marketed and sold the Trucks to Ferguson, including in the course of making the misrepresentations and omissions associated with the Defect, as detailed herein.

**E. Navistar's Representations Regarding the MaxxForce Engines**

84. Navistar made numerous, repeated false public statements that their engines would meet the 2010 EPA Standards, that Advanced EGR was a "proven technology" that would provide a "no-hassle emissions solution," that the Engines would be just as reliable and durable as their earlier engines not utilizing Navistar's then-latest EGR technology, and that the Trucks equipped with Advanced EGR would have a "much higher residual value" on the used truck market than trucks equipped with SCR.

85. For example, Navistar stated in its Form 10-K annual report in 2011 that it believed that an EGR-based engine it submitted to the EPA met EPA's certification requirements. In actuality, as alleged by the Securities and Exchange Commission, the EPA

told Navistar before Navistar filed its 10-K that the proposed engine did not appear to qualify for certification.[2]

86. In a separate application to the EPA for an EGR-based engine approval, the EPA "raised several serious concerns" that Navistar would have to tend to before EPA could approve of the engine. Navistar nevertheless publicly called the application a "milestone" in a conference call with analysts and investors, explaining that the application was proceeding in a customary timeframe and that Navistar could begin producing the engine in June 2012.[3]

87. As alleged by the SEC, Navistar "created the misleading impression" that its MaxxForce 13 at .2g NOx, which it had submitted for EPA certification, was commercially competitive. However, "Navistar did not consider the engine to be commercially competitive, and, accordingly, Navistar could not put the engine into production even if certified by the EPA."[4]

88. Navistar press releases regarding the MaxxForce engines quoted Ramin Younessi, group vice president of product development and business strategy, as stating that the MaxxForce engines were "some of the cleanest and most energy-efficient diesel engines ever produced."

89. Navistar press releases also quoted Jim Hebe as stating that the MaxxForce 15 engine with Advanced EGR "gives customers the ultimate combination in durability and power."

---

[2] SEC: Navistar International and Former CEO Misled Investors About Advanced Technology Engine, available at https://www.sec.gov/news/pressrelease/2016-62.html (last accessed December 6, 2016).

[3] *Id.*

[4] *In the Matter of Navistar International Corporation*, Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease and Desist Order, ¶15 (March 31, 2016), available at https://www.sec.gov/news/pressrelease/2016-62.html (linking to SEC order-Navistar and last accessed December 6, 2016).

90. Navistar press releases represented that the MaxxForce Advanced EGR Engines were a "no-hassle, business-as-usual solution that will deliver lower total operating costs for customers." The press releases also stated that prior to launching sales of Navistar vehicles with Advanced EGR solutions, Navistar test vehicles had "logged millions of driving miles in real-world solutions."

91. Navistar marketing materials state that "MaxxForce Engines deliver: Reliability; Durability; Power; Performance; [and] Fuel Economy" and that the Engines are a "no-hassle" solution that "eliminate the hassle of…additional maintenance…."

92. Navistar also made a number of public statements regarding the lower cost of ownership and superior fuel economy of the Engines when compared to other engines equipped with an SCR system. Those statements include, among others:

a. At a conference call for investors, analysts, and media representatives on December 22, 2010, President and Chief Executive Officer David Ustian stated, "The fuel economy of the [MaxxForce 13-liter engine] will be better and there will be no change in the head rejection at the same time, so this product will be even better."

b. At a conference call for investors, analysts, and media representatives on January 25, 2011, Chief Financial Officer Jack Allen stated, "Well, the facts are out, our products are out there and they're delivering actually a little bit better than what we said on fuel economy, durability, the whole thing…the MaxxForce is doing phenomenal. We're seeing 9% better fuel economy than the prior model. The MaxxForce 13, as I've said the fuel economy is at parity or better than anything in

the market and we'll be applying for our 0.2 certification here in the next couple of months."

c. In a *Transport Topics* article published on July 29, 2010 and a *Fleet Owner* article published on July 20, 2010, representatives of a Navistar were quoted making claims about the MF ProStars' "fluid economy" saying, "The results were clear. In the comparison of fluid economy, the International ProStar+ with MaxxForce 13 Advanced EGR consistently outperformed the competing trucks 1% to 2.5%."

d. In a *Fleet Owner* article published on July 20, 2010, the Senior Vice President, North American Sales, Jim Hebe, said "If liquid urea SCR trucks can't compete on fluid economy, then why would customers want to deal with the cost and hassle of adding and maintaining after-treatment equipment, finding and filling up with liquid urea and retraining technicians?"

93. Navistar also made numerous representations about the Trucks' reliability, maintenance, and repairs. Some examples of these statements are:

a. At a conference call for investors, analysts, and media representatives on March 9, 2011, President and Chief Financial Officer David Ustian stated, "Since we were the only ones out there, there is a lot coming at us with 'oh, this can't work.' And of course, now we're out in the marketplace, and that's over. That argument's over. We're out there in the marketplace. We're exceeding what we had committed to in terms of performance and fuel economy and all that. So that's over."

b. At a conference call for investors, analysts, and media representatives on June 7, 2011, President and Chief Financial Officer David Ustian stated, "We haven't

heard any signs of—any even discussion on it, other than the benefits that we get from EGRs, lower weights, and not having to deal with urea. But as far as any discussion on SCR versus EGR, those things were passed a long time ago.

c. At a conference call for investors, analysts, and media representatives on September 7, 2011, Chief Financial Officer Andrew Cederoth stated, "This technology is proving extremely viable providing fuel economy and performance on par with the best SCR competitors…As we develop .20g NOx capability our goal of continuing to improve performance and fuel economy at this emissions level is being realized."

d. At a conference call for investors, analysts, and media representatives on December 20, 2011, President and Chief Executive Officer David Ustian said, "We compete against everyone that's out there on a product, not on a technology. So as long as our product performs as well or better, we can price not based on cost, but based on vehicle, and that's exactly what we've been able to do."

e. At a conference call for investors, analysts, and media representatives on February 1, 2012, North American Truck Group Preside Jack Allen stated, "We are providing equal or better performance than the SCR systems without any of the costs, without the maintenance or without the hassle of SCR."

94. Other representations relating to the MF ProStar's reliability and outstanding performance were available to the public, including Ferguson, via the navistar.com website.

95. Navistar also made representations regarding Engine reliability in Navistar brochures. For example, Navistar's "Maintenance Information Guide" stated: "(i) that the MaxxForce Advanced EGR had "lower operating costs" and "less hassle"; (ii) that the

MaxxForce Advanced EGR resulted in "optimal performance and low cost of ownership"; (iii) that the design of MaxxForce Advanced EGR resulted in "better fuel efficiency," "more power to the wheels and less soot out the exhaust," and "improved combustion,"; (iv) that the "Dual-path EGR cooling provides optimized cooled EGR…[that] allows long-term system performance; (v) that the MaxxForce Engine had "Premium Reliability"; (vi) that the "MaxxForce Engine can be counted on to show up for work every day"; and (vii) that the MaxxForce Engine was "always performing."

96. In addition to the false statements Navistar made to the general public, Navistar also made several false statements about the Engines and Trucks to Ferguson in particular.

97. The Navistar defendants, wanting to sell Ferguson the Trucks with MaxxForce engines, invited representatives from Ferguson and Wheels LT ("Wheels"), Ferguson's fleet manager, to a meeting one or more times in or about 2009 and 2010. At least one such meeting took place at a Navistar Factory in Illinois.

98. Representatives from Ferguson and Wheels agreed to and did attend a meeting at the Navistar Factory in Illinois.

99. Representatives of both Navistar defendants were present at that meeting. One purpose of that meeting was to ensure that Ferguson and Wheels would choose International-brand trucks with MaxxForce Engines when purchasing vehicles produced under the regime of the 2010 EPA Standards.

100. To convince Ferguson to purchase the Trucks with MaxxForce engines, Navistar discussed the technology it has chosen in light of the 2010 EPA standards. Navistar said that their technology was better than competing SCR technology, and the fact that every other company chose SCR technology made them "sheep."

101. Navistar told Ferguson at this meeting that the Trucks were high-quality products.

102. Another purpose of the meeting was for Ferguson to get to know Navistar's representatives so that the company could have and/or maintain a direct relationship.

103. During the meeting, Navistar showed Ferguson representatives a number of MaxxForce engines on the assembly line at the plant. As Ferguson was observing the MaxxForce engines, Navistar representatives spoke about how proud the company was of its EPA 2010 technology.

104. Navistar representatives told Ferguson representatives that International trucks with MaxxForce-brand diesel engines were safe and reliable.

105. Navistar representatives gave Ferguson representatives a brochure during the meeting that provides more details about the MaxxForce engine for the 2010 EPA compliant Trucks and the EGR technology that Navistar was selling.

106. On information and belief, Navistar representatives told Ferguson that MaxxForce engines beginning with model year 2010 were less susceptible to damage than previous years' model engines.

107. On information and belief, Navistar representatives told Ferguson that MaxxForce engines beginning with model year 2010 would have "fewer leak paths."

108. On information and belief, Navistar representatives told Ferguson that MaxxForce engines beginning with model year 2010 would have Crankcase Ventilation Systems that would be "maintenance free."

109. Navistar representatives also told Ferguson representatives that the MaxxForce EGR engines would be just as reliable as previous International-brand models, that the trucks

were free from defects, and that they would have much higher residual value than trucks running on competing technology.

110. Navistar representatives billed the Engines as superior to competitors' engines with SCR technology because Navistar's Engines did not require truck drivers to monitor the truck's on-hand supply of Diesel Exhaust Fluid (DEF), as was required in SCR-based systems because the DEF tanks needed to be refilled approximately every 2.5 fuel tank fill-ups. Navistar representatives advertised this difference as superior because EGR system did not require the driver to interact with or monitor it.

111. Navistar representatives told Ferguson that the Engines had greater cooling capability than competitors' engines running on SCR technology.

112. Navistar representatives told Ferguson that Ferguson would incur additional costs if it selected competitor engines running on SCR technology as opposed to selecting Navistar's Engines running EGR technology.

113. Upon information and belief, Navistar also made representations regarding reliability performance and operating costs through its authorized dealers and other members of the Navistar Network.

114. Navistar made these representations to Ferguson, both directly and indirectly through the Navistar Network, to induce Ferguson to purchase International-brand trucks with MaxxForce EGR engines.

115. Relying on Navistar's representations, Ferguson authorized Wheels' purchase of nearly 500 Navistar trucks with MaxxForce EGR engines for the benefit of Ferguson.

### F. Navistar Concealed the Defect from Ferguson

116. Despite knowing or having the obligation to know that its EGR technology did not work, Navistar failed to inform Ferguson of the Defect. Instead, it represented that the MaxxForce engines were free of defects and fit for medium and heavy duty trucking.

117. Navistar did not inform Ferguson of the Defect when representatives from the companies met at a Navistar factory in 2009 or 2010. Navistar concealed its knowledge of the Defect from Ferguson so that Ferguson would purchase from Navistar-authorized dealers 2010 International-brand trucks with MaxxForce EGR engines.

118. Navistar failed to inform Ferguson of the Defect even when Ferguson brought to Navistar's attention the chronic failures of the Trucks. Indeed, Ferguson informed Navistar that Trucks had undergone multiple repair attempts, that those problems often required towing, and that rental units were needed to make up for the time the Trucks were out of service. Not only did Navistar refuse to disclose the existence of the Defect, Navistar also refused to either credit Ferguson with the estimated diminution of the value of the Trucks or to replace the Trucks with a properly functioning unit.

119. For example, Ferguson representatives initiated a conference call with Navistar representatives and internal stakeholders to discuss the poor quality of some of the worst-performing Trucks. Ferguson asked Navistar to explain what was wrong with the Trucks. Navistar would not explain, and offered Ferguson no relief.

120. As another example, Ferguson representatives met with Navistar account representatives Steve Billings and internal stakeholders. Again, Ferguson asked Navistar to explain what the cause of the problem for some of the Trucks that had broken down numerous times. Again, Navistar provided no answers and offered no solutions to Ferguson.

121. Ferguson representatives also separately attempted to initiate contact with Navistar's legal department on several occasions, and contacted at least three different people. Navistar never responded to Ferguson.

122. Navistar refused to tell Ferguson about the Defect, even though Navistar knew that the Trucks Ferguson had purchased were Defective, so that Ferguson would continue to purchase International-brand trucks with MaxxForce EGR engines.

123. On information and belief, Navistar knew or should have known of numerous other complaints about the EGR system, including: the potential dangers of the EGR system, problems with the leaks in the exhaust pipes between the EGR valve and the exhaust manifold, and Navistar's failure to repair the problem despite repeated complaints and visits to Navistar service centers.

124. Instead of admitting to the Defect, Navistar continued to tout its EGR technology as the future of emissions technology and failed to disclose that the Defect was not fixable. Navistar blamed the Truck issues Ferguson experienced on manufacturing problems (which they claim to have resolved) and continued to portray the engines as reliable. Navistar did this so that Ferguson would not realize that the safety and reliability problems it experienced were due to the Defect.

125. Among other things, Navistar failed to disclose to Ferguson that coolant consumption caused by the Defect was outside the normal range.

126. At the same time as Navistar was making these false statements to both Ferguson and to the general public, its officers were outspoken critics of SCR. For example, Jim Hebe, Senior Vice President of North American Sales Operations frequently criticized competitors' SCR offering, and was quoted as saying SCR "could be the biggest false-start in trucking

history." Deepak Kapur, President of the Truck Group, called SCR a "marooned technology" that would immediately be abandoned by all manufacturers in favor of Advanced EGR.

127. Despite Navistar's criticism of SCR, Navistar announced in July 2012 that it was abandoning Advanced EGR and adopting for the 2013 model year the same SCR technologies that its competitors had been using.

128. Even after announcing the switch to SCR technology, Navistar continued to sell the Trucks with EGR-based engines even though Navistar knew they had the Defect.

129. On information and belief, Navistar knew when it announced the switch to SCR that Trucks that had EGR-based engines would face a weak resale market.

130. In August 2012, discussing Navistar's announcement that beginning in March 2013 it would equip their International Trucks with SCR and abandon Advanced EGR, the Commercial Carrier Journal quoted Jack Allen, North American Truck Group President, downplaying any problems with the Advanced EGR engine Trucks:

> Customers should not be hesitant to purchase an EGR-only MaxxForce-equipped truck between now and March, Allen said. And likewise, he predicted concerns over the resale value of EGR-only MaxxForce will prove to be temporary.
>
> "The judge didn't void the trucks," he said of [an appellate court ruling involving whether the EPA followed proper procedures in implementing a certain policy].[5] "Check out the Website about trucks sold under the interim rule. Nothing will happen. And as for used truck values? We feel the secondary market will be very receptive to a truck built without SCR. Our MaxxForce fuel economy is great. Our performance is great. And we have more than 50,000 of those engines out there."[6]
>
> "We can't afford any more teething problems," [Vice President for North American Product Development] David Majors conceded, referencing problems with MaxxForce reliability. Tim Schick, vice president of North American engine sales, said those problems were a result of production ramp-up problems and not related to EGR or high engine temperatures as rumored…Inexperienced

---

[5] *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013).

[6] http://www.ccjdigital.com/navistar-devises-plan-to-counter-losing-egr-gamble/ (last accessed December 6, 2016).

> employees led to problems with leaking EGR coolers and some valving issues, he said. "Those issues cleared up as more experienced employees taught the newer ones."

131. Had Ferguson been advised of the Defect, it would not have purchased the Trucks.

### G. MaxxForce EGR Engines are Defective and Cause Expensive and Unsafe Problems

132. Contrary to Navistar's many representations about the Trucks' fitness, reliability, and low operating costs, Ferguson experienced numerous, repeated breakdowns and other problems caused by the Trucks' Defect.

133. The Trucks were defective in that the Advanced EGR System recirculated a very large percentage of engine exhaust into the cylinders. Because of the additional recirculated exhaust, Navistar's EGR system generated far more heat within the engine than in the SCR engines. This excessive heat and pressure, in turn, causes broken EGR valves; exhaust leaks that melt and destroy other engine components; EGR cooler failures, which send uncooled exhaust gas back into the engine (causing the computer to shut down the engine) and other types of sudden and accidental physical injury to the Engine. The Defect also causes the EGR cooler to leak coolant through the EGR valves into the engine. The added stress of pushing non-flammable coolant out of the exhaust valves in the cylinder head destroys the head gasket, which joins the head to the cylinders. This results in the engine having to be rebuilt.

134. As a result of the Defect, Ferguson also experienced many repeated instances of check engine lights illuminating, which placed constant stress and persistent distraction on Ferguson drivers; engine derating; bearing and belt failures; cooling failures; A/C blower and compressor failures; hose/connector clogging and failure; DPF clogging; total disablement; inadequate air conditioning performance; overheating; EGR system failure; inability to handle

lengthy periods of engine idle; rough idle; chronic difficulty in starting the engine; instances of the engine not starting; chronic engine stall; loss of power during driving activities; and other issues that prevented the Navistar Trucks from functioning as warranted and represented.

135. The Defect also rendered the MaxxForce Engines unreasonably dangerous at the time they were purchased or leased. The Defect has led to sudden breakdowns, forcing Trucks, often heavily loaded with cargo, to attempt emergency maneuvers, such as pulling to the side of the road. These emergency maneuvers put Ferguson drivers and the public at risk. The Defect also causes coolant and exhaust fumes to enter the passenger compartment of the Trucks, risking driver poisoning from the fumes.

136. Some Ferguson drivers of Navistar Trucks who underwent such dangerous experiences with the Trucks refused to re-enter and continue driving Navistar vehicles. As one example, a driver refused to continue driving the Trucks when a Truck completely shut down on the middle of the highway. Ferguson was forced to replace these Trucks at its own expense when Navistar refused to take back the Trucks.

137. The Defect has caused, and is substantially certain to continue to cause, the MaxxForce Engines to fail repeatedly within their intended and expected useful life.

138. Ferguson cannot earn money from its commercial trucks when they are sitting in the shop for repairs. Ferguson has suffered not only the loss of use of a truck itself, but also a loss of use of other tangible property, such as trailers and other equipment that cannot be used when a truck is out of service. Further, the relationships between Ferguson and its customers were harmed because the defective MaxxForce engines prevented Ferguson from providing reliable service to its customers.

139. Ferguson, having relied on Navistar's representations to buy hundreds of Navistar Trucks, incurred many millions of dollars in damages as a result of the problems caused by the Defect.

140. Damages resulting from the Defect include, but are not limited to:

a. Payment of a higher price at the point of purchase or lease than would have prevailed in the market had the Defect been known;

b. Receipt of a Truck worth less than a non-Defective truck;

c. The cost of repairs;

d. The cost of towing;

e. The cost of renting replacement vehicles during Truck downtime. Rental trucks often cost Ferguson over $4000 per week;

f. The cost of purchasing replacement vehicles when so many Trucks were on downtime that Ferguson was forced to purchase outright replacement units

g. The maintenance costs of replacement units;

h. Costs resulting from Truck downtime during repairs. The amount of downtime varied, but almost always lasted for several days and often lasted for two weeks or more per repair;

i. Loss of profits and revenue because the Trucks were not in service as much as Navistar promised and represented that they would be;

j. Harm to commercial reputation stemming from the effects of hauling merchandise on unreliable vehicles, such strained relationships with customers because of late product delivery;

k. Loss of value at resale. The resale losses were often up to $20,000 or more per Truck; and

l. Any other financial loss suffered as a result of the Defect.

141. The trucking industry is now well aware of the problems with the Engines. Not only were the Trucks equipped with these Engines worth far less at the time of purchase or lease than they would have been with an engine free from defects, the Trucks have a significantly diminished value on the resale market compared with competitors' trucks with similar mileage. The trucks are very difficult to sell. Ferguson is stuck with an unfixable Defect and a greatly diminished market for resale or trade-in of the used Trucks.

## V. Tolling of the Statute of Limitations

142. **Discovery Rule.** Ferguson's claims accrued upon discovery that the EGR emissions system designed into the MaxxForce Engines was defective in that it led to the repeated failure of various truck parts, and that the Defect could not be repaired. Ferguson could not and did not discover the Defect through reasonable diligent investigation until after the Trucks experienced failures, could reasonably exclude other potential causes of the failures, learned that ordinary "repair" attempts from Navistar-authorized mechanics did not solve the problem, and discovered that the Engines themselves caused the failures.

143. **Active Concealment Tolling.** Any statutes of limitations are tolled by Navistar's knowing and active concealment of the fact that the Engines suffered from an inherent design Defect. Navistar kept Ferguson ignorant of vital information essential to the pursuit of its claim, without any fault or lack of diligence on the part of Ferguson. For example, Navistar, during a meeting with Ferguson in February 2012, falsely blamed part suppliers for quality issues relating to the Trucks. Additional details of Navistar's efforts to conceal its above-described unlawful

conduct are in its possession, custody, and control, to the exclusion of Ferguson, and await discovery. Ferguson could not reasonably have discovered the fact that the Trucks it purchased suffered from an inherent design Defect that would cause repeated and significant failures.

144. **Estoppel.** Navistar was and is under a continuous duty to disclose to Ferguson the true character, quality, and nature of the Engines. At all relevant times, Navistar knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Engines. For example, Navistar, during a meeting with Ferguson in February 2012, falsely blamed part suppliers for quality issues relating to the Trucks. Additional details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Ferguson, and await discovery. Ferguson reasonably relied on Navistar's affirmative misrepresentations and knowing, affirmative, and/or active concealment. Navistar is therefore estopped from relying on any statutes of limitation in defense of this action.

145. **Equitable Tolling.** Navistar took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased the Trucks with the defective EGR-based Engines. For example, Navistar, during a meeting with Ferguson in February 2012, falsely blamed part suppliers for quality issues relating to the Trucks. Additional details of Navistar's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Ferguson, and await discovery. When Ferguson learned about this material information, it exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing its claim. Navistar fraudulently concealed its above-described wrongful acts. Should such be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VI. Causes of Action

### First Cause of Action
### Breach of Implied Warranty

146. Ferguson incorporates here the allegations set forth above.

147. Navistar is and was at all relevant times a merchant with respect to the Engines.

148. Navistar is in actual or constructive privity with Ferguson. Ferguson's dealings with Navistar are sufficient to establish any required privity of contract. Navistar met directly with Ferguson at a Navistar factory for the purpose of inducing Ferguson to purchase the Trucks. Further, Ferguson had an ongoing, direct business relationship to Navistar as it related to Ferguson's fleet of Navistar trucks. Ferguson had a dedicated Navistar account representative, Steve Billings, and maintenance representative, and a service representative. Ferguson worked directly with Navistar to select and purchase vehicles.

149. In addition, Navistar's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Engines and have no rights under any implied warranty of the Engines. The warranties implied by law are designed for and intended to benefit the ultimate consumer: Ferguson.

150. Ferguson's purchasing agents—Penske, Ryder, Salem Lease, TCF Equipment Finance, and Wheels LT—were not the ultimate purchaser of the Trucks, Ferguson was. Though Ferguson's purchasing agents signed on behalf of Ferguson, those entities acted under the express authority of Ferguson.

151. Navistar advertised its Trucks to Ferguson, made several representations about its Trucks to Ferguson, and understood that it was Ferguson who was ultimately purchasing the Trucks.

152. In the alternative, privity is not required to assert this claim because Ferguson is an intended third-party beneficiary of the contracts between Navistar and its dealers, franchisees, representatives, and agents. Navistar knew at all times that Wheels signed for the purchase of the Trucks so that Ferguson would use them as part of their trucking fleet.

153. At all times, applicable law imposed upon Navistar a duty that the Engines be fit for the ordinary purposes for which engines are used and that they pass without objection in the trade under the contract description.

154. Navistar has not validly disclaimed, excluded, or modified the implied warranties or duties described above.

155. The Engines were defective at the time they left the possession of Navistar, as explained above. Navistar knew of the Defect at the time the purchase and lease transactions occurred. Thus, the Engines, when sold and at all times after, were not in merchantable condition or quality because they are not fit for their ordinary intended purpose and they do not pass without objection in the trade under the contract description.

156. Ferguson met all of its obligations under the warranties. Ferguson used the Engines in a manner consistent with the intended use.

157. Navistar had actual knowledge of, and received timely notice regarding, the Defect at issue in this litigation and, not withstanding such notice, failed and refused to offer an effective remedy.

158. In addition, Navistar received, on information and belief, thousands of complaints and other notices from customers advising of the Defect associated with the Engines.

159. By virtue of the conduct described in this Complaint, Navistar has breached the implied warranty of merchantability.

160. As a direct and proximate result of Navistar's breach of warranties, Ferguson suffered economic harm, including loss attributable to the diminished value of their Engines, loss of use of the Trucks and other tangible property, as well as the money spent and to be spent to repair and/or replace their Engines.

**Second Cause of Action**
**<u>Breach of Express Warranties</u>**

161. Ferguson incorporates here the allegations set forth above.

162. Navistar sold Ferguson Trucks with defective Engines.

163. For each Truck that Ferguson purchased from Navistar, Navistar warranted that that it would, among other things, repair or replace any part of the Engine that was defective.

164. Specifically, Navistar promised in its "Limited Warranty" (exemplar attached as Exhibit A) to "repair or replace any part of this vehicle which proves to be defective in material or workmanship."

165. In addition to the "Limited Warranty," Ferguson also purchased from Navistar even more fulsome protection through Navistar's "Optional Service Contracts" (exemplar attached as Exhibit B). For an additional per-Truck fee paid by Ferguson, Navistar promised to repair and replace Engine parts, among other things, beyond the time period provided by the "Limited Warranty."

166. This warranty was part of the basis of the bargain by which Ferguson purchased the Trucks.

167. Ferguson complied with all of its obligations under the express warranties. Ferguson used the Engines in a manner consistent with their intended use. When the Defect caused repeated failures in trucks Ferguson purchased, Ferguson brought its trucks to authorized Navistar service centers for repairs.

168. The express warranties obligated Navistar to pay for costs incurred in replacing the defective Engines.

169. The express warranties required Navistar to properly repair the Defect.

170. Navistar has breached its express warranties to Ferguson by failing to properly repair or replace the defective Engines or components that rendered the Engines defective when Ferguson presented the Trucks for repair and/or by claiming to have "repaired" the Engines by replacing them with Engines with the same Defect that the original Engine had.

171. Because Navistar either could not or would not repair the Defect, Navistar breached its warranty because the warranty failed its essential purpose.

172. Navistar had actual knowledge of (or received timely notice regarding) the Defect at issue here and nonetheless failed to provide an effective remedy to Ferguson.

173. On information and belief, Navistar has received thousands of complaints and other notices from customers relating to the same engine problems Ferguson faced with the Trucks.

174. Navistar cannot limit its express warranties because to do so would be unconscionable. Enforcing any warranty limitation would be unconscionable because: (1) the Trucks were defective at the time of sale; (2) Navistar knew or should have known about the Defect before offering the Trucks for sale; and (3) Navistar concealed and did not disclose the Defect, and did not remedy the Defect before selling the Trucks. And to the extent Navistar claims that a limitation to "material and workmanship" excludes defective design, that limitation is also unconscionable. Any effort by Navistar to limit its liability is null and void here.

175. Navistar is in actual or constructive privity with Ferguson. Ferguson's dealings with Navistar are sufficient to establish any required privity of contract. Navistar met directly

with Ferguson at a Navistar factory for the purpose of inducing Ferguson to purchase the Trucks. Further, Ferguson had an ongoing, direct business relationship to Navistar as it related to Ferguson's fleet of Navistar trucks. Ferguson had a dedicated Navistar account representative, Steve Billings, and maintenance representative, and a service representative. Ferguson worked directly with Navistar to select and purchase vehicles.

176. Further, Ferguson dealt directly with Navistar when discussing Trucks subject to warranty repairs. For example, Ferguson representatives spoke weekly with Navistar representative Chuck Matthews to discuss breakdowns as they related to Navistar warranties and other problems with the Trucks. As another example, Ferguson representatives regularly spoke to Joe Mazur about breakdowns and other problems with the Trucks.

177. In addition, Navistar's authorized dealers, franchisees, representatives, and agents were not intended to be the ultimate consumers of the Engines and have no rights under any express warranty of the Engines. The express warranties here were designed for and intended to benefit the ultimate consumer: Ferguson.

178. Ferguson's purchasing agents—Penske, Ryder, Salem Lease, TCF Equipment Finance, and Wheels LT—were not the ultimate purchaser of the Trucks, Ferguson was. Though Ferguson's purchasing agents signed on behalf of Ferguson, those entities acted under the express authority of Ferguson.

179. Navistar advertised its Trucks to Ferguson, made several representations about its Trucks to Ferguson, and understood that it was Ferguson who was ultimately purchasing the Trucks.

180. In the alternative, privity is not required to assert this claim because Ferguson is an intended third-party beneficiary of contracts between Navistar and its dealers, franchisees,

representatives, and agents. Navistar knew at all times that Wheels signed for the purchase of the Trucks so that Ferguson would use them as part of its trucking fleet.

181. Navistar's breach of its express warranties caused Ferguson to incur damages. Ferguson is entitled to recover those damages as set forth here. Those damages include, but are not limited to: (1) compensatory damages (e.g., the difference between the value of the goods as accepted and the value of the goods as warranted); (2) incidental damages; and (3) consequential damages.

**Third Cause of Action**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

182. Ferguson incorporates here the allegations set forth above.

183. Ferguson entered into agreements to purchase or lease Engines with Navistar or otherwise was in contractual privity with Navistar as a result of Ferguson's direct dealings with Navistar.

184. The purchase contracts were subject to the implied covenant that Navistar would conduct business with Ferguson in good faith and would deal fairly with them.

185. Navistar breached those implied covenants by failing to disclose that any repair or replacement of defective parts in Ferguson's Engines would not cure the Defect.

186. As a direct and proximate result of Navistar's breach of its implied covenants, Ferguson has been damaged in an amount to be determined at trial.

**Fourth Cause of Action**
**Negligent Misrepresentation**

187. Ferguson incorporates here the allegations set forth above.

188. Navistar manufactured, distributed, and sold to Ferguson Engines that Navistar knew contained an inherently dangerous or defective condition.

189. Navistar continued to manufacture, distribute, and sell the Engines to Ferguson after having received numerous, serious complaints of systematic product failure due to the dangerous or defective condition.

190. Navistar did not disclose this dangerous or defective condition to Ferguson, and the condition was not easily discoverable by Ferguson. Navistar knew or should have known that the Engines were defective and dangerous.

191. Navistar made affirmative representations, as detailed above, regarding the Engines' reliability, performance, and operating costs. Navistar knew or should have known that those representations were false.

192. Ferguson justifiably relied on Navistar's omissions and misrepresentations in that Ferguson would have purchased or leased different vehicles if Navistar had disclosed the Defect.

193. Ferguson was harmed by Navistar's misrepresentations regarding the dangerous and defective condition of the Engines and is entitled to damages as a result in an amount to be determined at trial.

**Fifth Cause of Action**
**<u>Fraudulent Concealment</u>**

194. Ferguson incorporates here the allegations set forth above.

195. Navistar omitted an existing fact about the Engines when it failed to disclose information regarding the Engines' dangerous and defective condition.

196. The omission is material because the defective condition poses a serious safety issue to Ferguson and to the public and affected the functionality and value of the Trucks.

197. The omission rendered Navistar's representations regarding the Engines false because the Engines were in fact defective.

198. Navistar manufactured, distributed, and sold the Engines despite having knowledge of their defective and dangerous condition.

199. Navistar intended that Ferguson would rely on Navistar's omissions regarding safety, reliability, and resale value of the Engines to bolster sales.

200. Ferguson was not aware of the defective condition and could not reasonably have discovered the defective condition.

201. Ferguson relied on Navistar's omission in that Ferguson would have purchased or leased different vehicles had Navistar disclosed the defective condition.

202. Ferguson had the right to rely on Navistar's omissions that created the false impression that the Engines were safe and reliable based on reasonable purchaser expectations that the Engines would not be designed such that they fail under normal conditions of use or would be substantially certain to fail before the end of their useful life.

203. Ferguson also had the right to rely on Navistar's omissions because Ferguson dealt directly with Navistar when it met with Navistar representatives at a Navistar factory, where Navistar described the Engines to Ferguson for the purpose of inducing Ferguson to purchase the Trucks.

204. Navistar had an affirmative duty to disclose the defective condition of the Engines to Ferguson because Navistar was in a superior position to know the true state of the defective Engines. Navistar knew of the defective and dangerous condition and the condition was not easily discoverable by Ferguson. Navistar breached its duty by failing to disclose the condition.

205. Navistar fraudulently concealed the defective condition of the Engines, causing damages to Ferguson in the form of repairs, replacement, diminished value, and other costs, as well as lost income from idled trucks and trailers.

**Sixth Cause of Action**
**Fraud in the Inducement**

206. Ferguson incorporates here the allegations set forth above.

207. As detailed above, Navistar made false and material misrepresentations regarding the Engines' quality, reliability, performance, and operating costs.

208. Navistar knew or should have known that these misrepresentations were false when it made them.

209. Navistar intended that Ferguson would rely on Navistar's misrepresentations regarding quality, reliability, performance, and operating costs when determining whether to enter into contracts to purchase or lease the Trucks.

210. Ferguson did not know that the misrepresentations were false, and Ferguson justifiably and reasonably relied on Navistar's misrepresentations when determining whether to enter into contracts to purchase or lease the Trucks.

211. Ferguson relied on Navistar's misrepresentations by entering into contracts to purchase or lease, and actually purchasing or leasing, the Trucks equipped with the defective Engines.

212. Ferguson would not have entered into contracts to purchase or lease Trucks with the defective Engines but for the fraudulent misrepresentations made by Navistar.

213. Navistar's false representations, fraudulently induced Ferguson into entering into contracts to purchase or lease the Engines, causing harm to Ferguson. Ferguson will seek affirmance of the contract with damages, or in the alternative, rescission with return of the Trucks in exchange for the full purchase or lease price.

**Seventh Cause of Action**
**Unjust Enrichment**

214. Ferguson incorporates here the allegations set forth above.

215. Navistar has been unjustly enriched by the sale of vehicles containing the defective MaxxForce Engines to Ferguson.

216. Ferguson conferred a benefit on Navistar, but Navistar failed to disclose its knowledge that Ferguson did not receive what it paid for and misled Ferguson regarding the qualities of the MaxxForce Engines, and the vehicles containing those Engines, while profiting from this deception.

217. Navistar also continues to be unjustly enriched by benefitting from, among other things: (i) the saved cost of not manufacturing a properly performing and safe EGR System in the Engines; (ii) the shifted risk and expense to Ferguson of the defective and dangerous EGR System in the Engines; and (iii) the return on investment on all above-described amounts.

218. It would be inequitable, unconscionable, and unjust to permit Navistar to retain the benefit of these profits that it unfairly obtained from Ferguson.

219. Ferguson, having been injured by Navistar's conduct, is entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Navistar to the detriment of Ferguson.

**Eighth Cause of Action**
**<u>Negligence</u>**

220. Ferguson incorporates here the allegations set forth above.

221. Navistar owed Ferguson the duty to design and manufacture the Engines in such a way as to ensure that the emissions systems would not fail and the Defect would not occur.

222. Navistar breached this duty by negligently designing and/or manufacturing the Engines, including, but not limited to, the negligent design and/or manufacture of the Engines' EGR system as more fully described in this Complaint.

223. As a direct and proximate result of Navistar's negligence, Ferguson has sustained damages, including repair costs and lost income from idle trucks and trailers.

## Ninth Cause of Action
## Violations of the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1, *et seq.*

224. Ferguson incorporates here the allegations set forth above.

225. The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") prohibits "unfair" and "deceptive" trade practices.

226. Ferguson is a "consumer" as defined in 815 ILCS 505/1(c) & (e).

227. Ferguson purchased Trucks from Navistar that were ordered from a Navistar-authorized dealer in Illinois.

228. Ferguson purchased Trucks from Navistar that are registered in the State of Illinois and bear Illinois license plates.

229. Navistar made affirmative misrepresentations about the Trucks to Ferguson when representatives from Ferguson and Navistar met at a Navistar factory in Illinois. Navistar made the affirmative misrepresentations for the purpose of inducing Ferguson to buy the Trucks from Navistar.

230. Navistar knew or should have known that the Engines in the relevant vehicles it sold to Ferguson were defective.

231. Despite the knowledge that Navistar had or should have had, Navistar failed to disclose to Ferguson that the Engines were defective at the time Ferguson purchased the trucks containing the defective Engines. To the contrary, Navistar made affirmative representations regarding the reliability, performance, and operating costs of the Engines.

232. Ferguson reasonably expected that their Trucks would not have defective Engines that caused their Trucks to repeatedly fail. The Trucks' repeated failure led to, among other

things, Ferguson's inability to use the Trucks for their intended purpose, lost revenue, deflated resale value, repair costs, and towing costs.

233. Navistar intended that Ferguson rely on Navistar's material misrepresentations and omissions of material facts.

234. Navistar's misconduct, including the misrepresentations and the omissions of material facts, took place in the course of trade or commerce in Illinois, and arose out of transactions that occurred in Illinois.

235. Navistar's misconduct is an unfair or deceptive act prohibited by the ICFA.

236. If not for Navistar's unfair and deceptive acts of both concealing from Ferguson that the Engines were defective and of affirmatively making representations about the Engines' reliability, cost, and performance, Ferguson would not have purchased the Trucks, or would have paid significantly less for them.

237. Navistar knew or should have known that Ferguson did not know and could not have reasonably discovered that the Engines were defective before purchasing the Trucks.

238. As a direct and proximate result of Navistar's violations of the ICFA, Ferguson suffered damages in the form of, among other things, lost revenue, loss of use of the Trucks and other tangible property, deflated resale value, repair costs, towing costs, and other expenses.

239. Navistar's violation of the ICFA entitles Ferguson to statutory and actual damages, punitive damages, attorneys' fees and costs, and all other relief allowed under the ICFA.

**Tenth Cause of Action**

**Violations of the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.***

240. Ferguson incorporates here the allegations set forth above.

241. Ferguson is a legal entity and, as such, is a “person” as defined by Bus. & Prof. Code § 17201.

242. Bus. & Prof. Code §17200 provides a private right of action for any person who is injured in his property by an unfair and/or deceptive act or practice.

243. By the conduct described in detail above and incorporated herein, Navistar engaged in unfair, unlawful, and/or fraudulent business practices in violation of Bus. & Prof. Code §17200 *et seq*.

244. Many of the Trucks Ferguson purchased from Navistar were ordered from Navistar-authorized dealers in California.

245. Many of the Trucks Ferguson purchased from Navistar were and are registered in the State of California and bear California license plates.

246. Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use. These omissions were contrary to Navistar’s representations regarding the Engines’ reliability, performance, and operating costs.

247. The facts regarding the Defect, which were intentionally concealed or not disclosed by Navistar to Ferguson, are material facts that a reasonable person would have considered in deciding whether or not to purchase or lease, or to pay the same price for, the Engines. Because only Navistar knew or could have known these facts, Navistar owed a duty to Ferguson to disclose them.

248. Navistar intended that Ferguson rely on the misrepresentations and omissions concerning the defective Engines so that the Ferguson would purchase Trucks equipped with the Engines.

249. Ferguson received Navistar's material misrepresentations before purchasing the Trucks. Ferguson justifiably acted or relied to its detriment upon those misrepresentations (and related omissions of fact concerning the Defect), as evidenced by Ferguson's purchase of the defective Engines and the subsequent problems Ferguson faced.

250. Had Navistar disclosed all material information regarding the defective Engines to Ferguson, Ferguson would not have purchased Trucks with the Engines, or it would have paid less for them.

251. Navistar's unfair, unlawful, and/or fraudulent business practices have deceived Ferguson, and those same business practices have deceived or likely deceived other members of the consuming public.

252. By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning of Business and Professions Code §17200, *et seq*.

253. Navistar knowingly sold Ferguson trucks with Engines that were so defective they were essentially unusable for the purposes for which they were sold.

254. The injuries to Ferguson greatly outweigh any alleged countervailing benefit to Ferguson under all of the circumstances. Moreover, in light of Navistar's exclusive knowledge of the defects, the injury is not one Ferguson could have reasonably avoided.

255. Navistar's acts and practices are unlawful because they violate Cal. Code §§1668, 1709, 1710, and Cal. Commercial Code § 2313.

256. As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, Ferguson has suffered actual damages and is entitled to recover such damages together with all other relief allowed under Section 17200, *et seq.*, plus attorneys' fees and costs of suit.

## Prayer for Relief

For the reasons described above, Ferguson demands judgment against Navistar on each Count of the Complaint and prays for the following relief:

1. Grant any reasonable request to amend this Complaint to conform to the discovery and evidence obtained in the action;
2. Empanel a jury to try this matter;
3. Award to Ferguson all compensatory damages provided for and consistent with its claims for relief;
4. Award to Ferguson all consequential damages provided for and consistent with its claims for relief;
5. Award to Ferguson all appropriate damages that the Court deems appropriate;
6. Award to Ferguson all exemplary and/or punitive damages allowed by law that the Court deems appropriate;
7. Grant Ferguson their reasonable attorneys' fees and costs incurred in this litigation as allowed by law;
8. Award costs and expenses incurred in this action as appropriate under Rule 54 of the Federal Rules of Civil Procedure;
9. Award pre- and post-judgment interest as allowed by law; and
10. Grant Ferguson such further relief as the Court may deem just and proper.

**JURY DEMAND**
Plaintiff demands a trial by jury.

Respectfully submitted,

**s/ H. Patrick Morris**

H. Patrick Morris, Bar Number: 6187083
Attorney for Plaintiff
Ferguson Enterprises, Inc.
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 984-0244
Fax: (312) 372-9818
E-mail: morrisp@jbltd.com

David F. Fanning, Bar Number: 6274895
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone: (312) 984-0289
Fax: (312) 372-9818
E-mail: fanning@jbltd.com

Andrew D. Kaplan
(*Pro Hac Vice* motion forthcoming)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
(202) 624-2500
E-mail: akaplan@crowell.com

James K. Stronski
(*Pro Hac Vice* motion forthcoming)
Crowell & Moring LLP
590 Madison Avenue
New York, NY 10022-2524
(212) 223-4000
E-mail: jstronski@crowell.com

Katie Yablonka
(*Pro Hac Vice* motion forthcoming)
Crowell & Moring LLP
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 365-7250
E-mail: kyablonka@crowell.com